**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**PANAMA CITY DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Respondent,** | : | **DOCKET NO. 5:09CR30-004** |
| | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **MICHAEL REED,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

---

**SENTENCING MITIGATION MEMORANDUM AND**
**REQUEST FOR DOWNWARD DEPARTURE AND VARIANCE**

---

COMES NOW, undersigned counsel on behalf of MICHAEL REED and respectfully submits the following Sentencing Mitigation information and request for downward departure and variance in the sentence pursuant to 18 U.S.C. § 3661, 18 U.S.C. § 3553 *et seq.*, Rule 32 of the Federal Rules of Criminal Procedure, and the Federal Sentencing Guidelines.[1]

---

[1]    Rule 32(c) set forth the requirements of the presentence investigation and the resolution of any disputes by findings of fact and conclusions of law. 18 U.S.C. 3661 states that "no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purposes of opposing an appropriate sentence. 18 U.S.C. 3553 sets forth the appropriate sentencing factors the court should consider both in relationship to the personal characteristics of the defendant, the offense and the Federal Sentencing Guidelines. The general text of the Federal Sentencing Guidelines should be considered but is advisory.

1

## I.

## COURSE OF PROCEEDINGS

On May 28, 2009, a federal criminal complaint and warrant were issued in the Northern District of Florida authorizing the arrest of Michael Reed for conspiracy to possess with intent to distribute a mixture and substance containing more than 500 grams of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(ii) and §846. In this indictment, Michael Reed was charged in Counts 1, 6, 7, 9, 10, 26, and 27. The charges stemmed from a March 1, 2006 and a May 27, 2009 incident in which Michael Reed purchased cocaine from a source for personal use and for that source to sell a portion thereof to pay for the cocaine.

On July 23, 2009, Michael Reed entered a plea of guilty to Count 1 of the indictment pursuant to the terms of a written plea agreement. The accurate drug weight for statutory purposes is at least 500 grams of cocaine but not more than 5 kilograms leaving a sentencing range under the statute of a minimum of five years. The quantity of cocaine identified in the PSR attributable to Reed is 2 kilograms of cocaine. Sentencing is scheduled for November 10, 2009.

## II.

## SUMMARY OF THE OFFENSE

Michael Reed's circumstances emanate from an individual named Hector Melara who was a well-known distributor of cocaine in the Panama City area since on or before 2006. Michael Reed was a renowned orthopedic spinal surgeon at the time that Melara supplied drugs to various individuals in the Panama City area. Reed did not know Melara during the time that Melara and Dario Espinosa, a co-defendant in this case, and others began their drug trafficking activities. The Presentence Report lays out the history of Melara and others who were distributing drugs that had nothing to do with Reed.

Reed met Melara through Amy Cooper. Their introduction was not made based on Melara's drug activities. Cooper introduced Reed to Melara at a restaurant in Panama City.

Sometime after they met, Melara asked Reed to investigate the possibility of helping him get his niece a kidney transplant. Melara's niece lived in Belize and was in need of a kidney transplant but could not afford one. Dr. Reed looked at her medical records and tried to help Melara find an organization that might pay for the transportation of his niece to the United States for her much-needed operation. (The medical records of Melara's niece were sent to Dr. Reed for his evaluation).

In December 2008, Dr. Reed and his family, including his children, set out on a cruise that included a stop in Belize. By happenstance, Melara was on the same cruise. In fact, Dr. Reed was expected to be on a completely different cruise when that cruise was cancelled and he was moved by the cruise line to the same cruise that Melara was on.

Once it was known that the two of them were on the same cruise, Melara offered to take Reed and his family to his home in Belize, which was approximately 55 miles from where the ship would dock, to meet his family, his niece, and to experience the lifestyle and local cuisine of Belize.

On the way back to the ship Melara asked Reed to divert the van that was carrying himself and his family to meet his cousin, Miguel. While Reed's family waited outside, Reed went inside the building where Melara said his cousin was located. There, Melara introduced Reed to his cousin who could not speak English. When Melara took Reed to visit his cousin, his cousin showed them some cocaine. Melara also provided Reed with a line of cocaine to do before he went back to the ship. There was no purchase, sales, or interest in buying cocaine from Miguel or Melara at this meeting.

Melara learned that Dr. Reed liked using cocaine. Melara sold Reed cocaine for his personal use in 2008. In or around early February 2009, Melara asked Reed for a $30,000 loan which

Melara told Reed was to purchase some tractor equipment for his property in Belize. Reed gave Melara the $30,000. Soon thereafter Melara contacted Reed and told him that he wanted to leave a kilogram of cocaine with Reed to hold as collateral for the $30,000.00 loan. Reed agreed and periodically gave a portion of the cocaine back to Melara to sell in order to pay back the loan. Melara sold about half of the cocaine while Reed and Cooper used the remaining cocaine for personal use. The second kilo of cocaine was intended to be purchased by Reed from Melara for personal use and for Melara to sell. This occurred in May 2009. The cost of that kilogram of cocaine was another $30,000.

Melara's history reveals that in dealing with undercover agents, he was exploring several options to obtain bulk quantities of cocaine long before he met Dr. Reed in October 2008. (PSR paragraphs 11-14, 24). It is also clear that Reed's use of cocaine created an addiction problem that influenced how he made decisions in relationship to his involvement with Melara and the purchase of cocaine. This is reinforced by the fact that Melara sold the cocaine to Reed for retail value and not for a value that would be associated with a drug operation and the purchase of cocaine for wholesale distribution.[2] Melara saw Dr.

---

[2]     Street value for one kilo of cocaine is estimated to be around $18,000.00 to $23,000.00 per kilo.

Reed as a mark for not only his abuse of cocaine but his willingness to supply Melara with money in order to get cocaine.

Dr. Reed admits his use of cocaine and other personal matters created a circumstance in which he used poor judgment. This judgment has led him to be deprived of his freedom, his profession, his reputation, and his family. These losses are not simple or commonplace. Dr. Reed has lost much more than anyone else in this case will ever lose. He did not have the foresight to know what he was losing because he was under the influence of a narcotic that diverts the emotional and mental health of a person in such a way as to make bad decisions about their lives. Clearly this is the only reason the offense occurred as Dr. Reed has no history of criminal behavior or any indicators of a propensity to commit crimes at any time in his life.

Dr. Reed was 55 years of age when this offense occurred. He has been a surgeon for 18 years in the practice of orthopedic spinal surgery medicine. His life has been dedicated to becoming a surgeon. To become the kind of surgeon Dr. Reed was requires extraordinary dedication, education and training. He is renowned in the community because of the type of surgeon he has been and the people he has helped. The real tragedy is that Dr. Reed has forever lost his ability to contribute to society in this manner in the future. He has lost an income of over $100,000 per month and has lost his ability to ever be a doctor again. His life is

in complete disarray in relationship to his family and his finances as a result of being incarcerated. He will never again have the opportunity to help the patients who have spoken out on his behalf or new patients who need the type of skill and gift that Dr. Reed posses. These factors are collateral punishment not adequately considered by the Federal Sentencing Guidelines. In addition to this, Dr. Reed has physiologically based psychological issues that contributed to his use of the cocaine which, in turn, contributed to his poor judgment in continuing to purchase cocaine from Melara. These are not excuses but present a cause and effect condition that explain why an otherwise stable extraordinary contributing member of society would suddenly change after 55 years.

Dr. Reed has also been the darling of the media attention in this case despite the fact that he is not the primary perpetrator of the criminal conduct that began long before Melara met Dr. Reed. Reed and his children have suffered from this media attention. Dr. Reed has been singled out as the most important person in the case when, in fact, he should not be in that position but for his high profile community status.

Dr. Reed is also in a catch-22 situation where on one hand he is the type of individual who, if incarcerated, sends a message to the greater community that doctors should not be given any special treatment while at the same time, he should be

7

given mitigating sentencing consideration based on his contributions to society that are not evidenced in many of the other more culpable codefendants. Punishing Dr. Reed more harshly due to the media attention generated from his involvement, or his status, is not reasonable nor a basis for a harsh sentence. The community can benefit more from someone like Dr. Reed with public service and public announcements on the danger of cocaine abuse among professionals than placing him in custody. Take for example the case of Rapper TI (Clifford Harris). He was a convicted felon on narcotics charges who was arrested for trying to buy multiple firearms including machine guns. His status was used to aid the public through community service and as a result he received a sentence of 12 months and one day in custody with 1500 hours of community service and 365 days of house arrest.[3] Clearly if Dr. Reed's status is relevant to deterrence to the public his background should support a similar outcome.

## III.

### GENERAL BACKGROUND INFORMATION

The Presentence Report sets out information concerning Michael Reed's background. There is, however, some additional information worthy of this Court's consideration as applied to the Federal Sentencing Guidelines and 18 U.S.C. § 3553 factors.

---

[3]    Findlaw database blotter March 27, 2009.

## A.    Marital

Michael Warren Reed married Susan Flake in 1981 in Martha's Vineyard, Massachusetts. They were divorced in 1986. There were no children from this union. Michael Reed married Myra Ancelet Reed on June 4, 1988. The couple separated in June 2006 and the marriage was dissolved by a partial final judgment of the dissolution of marriage on April 2, 2008. On October 14, 2008 a supplemental final judgment was entered ordering Dr. Reed to pay his former wife a substantial fund in both child support and alimony.

It is important to note that Dr. Reed learned Myra Reed was having an affair which caused their relationship to collapse. The relationship was already volatile and in a bad place when the affair was revealed. The emotional impact of this experience devastated Dr. Reed. The devastation was exacerbated by the contentious nature of the divorce. The divorce was emotionally and financially draining for Dr. Reed.

Attached as **Exhibit A** is a letter from the divorce attorney, James Novey, who represented Dr. Reed reflecting the contentious nature of the marital discord and divorce proceedings. This included a custody battle that resulted in Dr. Reed receiving less custody time with his children than he anticipated. Any incarceration exacerbates this conflict in that Dr. Reed will have limited opportunity to see his children as

his ex wife will be unlikely to bring the children to where Dr. Reed is located. Depending on what period of incarceration is imposed and where Dr. Reed is located will determine what if any visitation can be accomplished. At present Dr. Reed is having difficulty in seeing his children. The prison he is in will not let them all visit him at one time which requires someone to bring each child to the facility, one at a time. Only two people can visit at one time and no child can remain on the premises unaccompanied by an adult. It has been hard enough to get someone to bring the children together much less for three separate trips and visits. The facility where Dr. Reed is housed is approximately one hour from Panama City. Attached as **Exhibit B** is a letter from the parenting coordinator related to the children's problems and visitation concerns.

Dr. Reed's emotional and mental health began to deteriorate at the time of his divorce. The divorce was played out in the media and was a constant battle of accusations and frustration. During this time period Dr. Reed began drinking when he got off work, something he had not done on a regular basis before the divorce proceedings. Dr. Reed's life before the marital discord was confined to working and going home to be with his family and children. At work he spent every waking hour attending to his patients and his practice. At home he would spend his time with his children. During the long divorce proceedings Dr. Reed's

10

whole world was turned upside down personally and financially. He would often go home after work and have three or four cocktails before going to bed. It was the only way he could unwind. He was having trouble sleeping and could not relax. He began to self medicate with the increased use of alcohol and eventually cocaine. The divorce was but one event in a series of events that set an otherwise stable human being into a tail spin.

**B.    Business problems**

In addition to Dr. Reed's contentious divorce proceedings and trial in 2008, Dr. Reed's medical associates used Dr. Reed's success and then left him without financial support for the practice. Dr. Reed also suffered a financial setback when his business partners and others were a major factor in a real estate investment project collapsing. This resulted in an 8.9 million dollar judgment placed against Dr. Reed and others as a result of this investment. This conflict is unresolved.

**C.    Medical History**

In January 2009, after the divorce and the business problems, Dr. Reed suffered a devastating knee injury while playing soccer with his son. This injury required major surgery to repair the patellar tendon in his right knee. The physical limitations this injury inflicted kept Dr. Reed from being able to exercise or do anything to help reduce his stress. Dr. Reed

11

was and is an avid sports participant and exercise in the form of extreme skiing and other sports activities helped him cope with the stress of daily work and life.

The sequence of events from the marital discord, child custody conflict, investment failures, the business partnership dissolution and knee injury left Dr. Reed in an emotional spiral he could not control. Drinking and using cocaine increased during this time period. He did not drink or do cocaine while treating patients but did when he went home in the evenings or on weekends. Dr. Reed was using these substances to self-medicate his anxiety and to control what was out of control in his life. Addiction is a disease and creeps into a person's life without that person realizing the impact of the condition. Starting out slowly in using cocaine developed into a relationship with the source of the cocaine that provided Dr. Reed with the substance he needed to keep going while at the same time trying to make the money back from the purchase of the drugs.

In addition to the above, Dr. Reed suffers from Guillain-Barre Syndrome. This is a serious medical condition that is dangerous to his health and life. The court has in its possession a letter from Dr. Derbes articulating the medical history of Dr. Reed and this disease.

D.    <u>**Mental and Emotional Health**</u>

Dr. Reed has had undiagnosed brain physiochological and psychological conditions that have also worked against him in being able to effectively deal with the above series of physical and emotional traumas. Dr. Reed, from the above series of events, entered the perfect storm when he added to his problems the purchase of cocaine from a known drug dealer. His involvement in purchasing two kilograms of cocaine was the final event that put Dr. Reed's life over the edge.

Dr. Reed's work was the only thing holding him together. His only escape was to immerse himself in his work and isolate himself from his problems. He would deliberately work 70 hours a week to keep from facing his demons. It was only when he went home and had to deal with his personal life that he made bad choices.

It is easy to be an arm-chair quarterback to someone else's mistakes and problems. It is, however, more important to look at the facts of a person's life when those mistakes were made to determine truly just consequences that appropriately, but compassionately, deal with the offense and benefit society.

The Court has before it information from <u>Life Bridge Diagnostics</u> concerning the psychological and physiological health of Dr. Reed. In reviewing this information, it is quite evident that Dr. Reed had an addiction problem and other

13

physiological problems that were exacerbated by life events that needed treatment. Many doctors suffer from substance abuse and other problems that, once treated, allow them to return to their professions. Dr. Reed will not have the opportunity to return to his profession because he took the next step and committed a criminal act in association with that addiction. Dr. Reed fully acknowledges this and accepts responsibility for his actions. It is, however, important to recognize that what led to his criminal conduct were circumstances that changed the life that he had been living for 55 years without complications to one that was lost and disabled. Clearly something other than incarceration for what happened to Dr. Reed would be an appropriate disposition or at the very least a sentence that is **not more than necessary** considering the totality of the circumstances presented. Not more than necessary is a sentence that is less than the guidelines call for. (Due to the sensitive nature of the Life Bridges report and the fact that the court has a copy of this report and brain scan information filed with the PSR, an additional copy of the report is not being filed with this memorandum).

Hindsight is 20-20, and people in the community who do not know all of the circumstances might suggest that Reed should have seen that his actions would cause him all of the losses that he now faces. The trouble with this perception is that it

14

does not address his addiction, the medical problems, or emotional stress that existed in this case that are specifically a part of the reason Dr. Reed finds himself in these circumstances in the first place.

In this case, Dr. Reed's life fell apart. When his life started to fall apart, he took steps to try to cope that were not in his best interest. Addiction knows no boundaries but is treatable without incarceration. The punishments Dr. Reed will experience from his choices are far beyond any necessity for a strict guideline term of incarceration.

### E.    Community Service

In the period of more than a half-century Dr. Reed lived without major conflicts in his life, he did nothing but contribute to society, the community in which he lives and to the medical profession. Attached as **Exhibit C** are letters from organizations who have benefited from Dr. Reed's generosity. Included in these documents is a letter from the American Martial Arts Association, Inc. addressing Dr. Reed's sponsorship of two at-risk young children at their studio. Also included is a letter of thanks for the contributions Dr. Reed made to the Tanzania Project for the Woodlawn United Methodist Church. Dr. Reed has also provided:

1.    Yearly donations to area Elementary Schools to sponsor a child for 5th grade Washington D.C. trip. 2001 to Present;

2.   Gulf Coast Triathlon yearly donations. 1998 to Present;

3.   Make A Wish Foundation, Purchasing gifts from Stars on the tree at Christmas. 1991 to Present;

4.   Taunton Family Children's Home, Donations yearly. 2000 to Present;

5.   American Cancer Society, gifted a family home for vacation yearly at auction fundraisers. 2000 to Present;

6.   Relay For Life, Cancer Fun, donations yearly, 2006 to Present;

7.   Red Cross, Hurricane Katrina Victims $10,000.00 donation;

8.   Red Cross, $7500.00 Donation yearly. 1995 to Present;

9.   Arnold High School Golf Team, Donations/Sponsorships yearly. 2005 to Present;

10.  Local Burn Victim, Jenny Cowan, $5,000.00 toward her recovery;

11.  Arnold High School Tennis and Golf banquets catered. 2008/2009;

12.  Surfside Middle School Donations, 2006 to Present.

Dr. Reed is a highly educated orthopedic spinal surgeon. Dr. Reed went to medical school and graduated in 1985. He continued his post-graduate training and residency until he became a spinal surgeon in 1990. From 1990 to the present he has used his skills through his practice, "The Spinal Associates of

Panama City." He worked over 70 hours a week and provided employment for eleven people. (See **Exhibit D**, full resume).

Attached as **Exhibit E** are additional letters received from patients and colleagues. (Dr. Reed is aware that the Court has received copies of letters from patients, staff and professionals in the field of medicine who are associated with Dr. Reed in recognition of the contributions and work he has performed. The attached copies are a sample from all of the letters the court has received). This information should not be underestimated in terms of its value as to who Dr. Reed is. Dr. Reed's good character and contributions far exceed the events of this case.

## IV.

### DOWNWARD DEPARTURE AND VARIANCE FACTORS

The Federal Sentencing Guidelines must be considered but are advisory. Within the contents of the Federal Sentencing Guidelines are departure powers that a court can exercise in making a sentence more reasonable for aggravating or mitigating circumstances. Also, 18 U.S.C. § 3553 factors allow a court to use flexibility at sentencing by considering offense characteristics and offender characteristics that are specifically designed for individuals such as Dr. Reed. The Guidelines should not be reviewed as if they are the only way in which a sentence can be imposed. They are only part of the

17

court's consideration. If there ever was a case that deserved a departure from the guidelines or a variant sentence, it is Dr. Reed's case. For 55 years Dr. Reed has done everything right; in fact, exceeded the expectations of society as to what he should be doing. He has contributed to society in such a fashion that those contributions should be rewarded and, though they are sometimes financially rewarded, there are people that Dr. Reed helped for no money at all who can walk today because of his surgical skills. Some surgeons are skilled, yes, and can do the same thing that Dr. Reed does, but they are not as gifted. He is one of the best known spinal surgeons in the country and community. Patients go to him who have problems that no one else could solve. Do we condemn the mistakes that Dr. Reed made in committing the crimes that are now before this Court? Of course. But what is reasonable punishment for a person like Dr. Reed? What is the deterrent factor, what is the amount of punishment that will adequately serve the purpose of sentencing? Clearly, incarceration or lengthy incarceration is not necessary, though some incarceration may be warranted to appease the public perception of the circumstances Dr. Reed finds himself in. The Guidelines, however, in this case represent more time than necessary to accomplish the goals of justice pursuant to 18 U.S.C. § 3553.

Dr. Reed's suffering will continue for his lifetime even if he were to walk out of jail today. He has been incarcerated and isolated from the children he adores. Dr. Reed has lost his financial resources forever, his reputation, his community standing and his license to practice medicine. Forever is a circumstance that does not allow Dr. Reed to ever be a doctor again. He is under emergency suspension from the medical licensing board (Florida Department of Health), and is expected to get no less than 15 years minimum mandatory suspension time that does not even take effect until after the sentence in this case is fully and completely served, including any supervised release term. This collateral punishment is itself overwhelming. Dr. Reed will have difficulty ever being able to work in any profession, much less one that is in his field of expertise and education. He will be scrutinized heavily in anything he does. He not only lost his profession but lost the purpose of his education and his reputation. These factors alone authorize a variant sentence pursuant to 18 U.S.C. § 3553 and are not adequately considered in the advisory guidelines.

The essential components of a system that can produce sentences that meet the purposes of sentencing, avoid unwarranted disparities, and take account of individual circumstances, and that can evolve over time, is the ability of district court judges to impose non-guideline sentences within

the framework of 18 U.S.C. § 3553(a), to explain those sentences, and to have their judgments respected. District court judges can fulfill this uniquely vital role now that they are no longer required, or permitted, to defer to the Commission policy judgments. "After independent evaluation, a judge may conclude that the guideline sentence itself fails properly to reflect §3553(a) consideration, the guidelines reflect an unsound judgment, or . . . do not generally treat certain defendant characteristics in the proper way" or "the case warrants a different sentence regardless." Rita v. United States, 127 S.Ct. 2465, 2468 (2007).

## A.   <u>Traditional Departures</u>

Though the guidelines are advisory they still are to be considered. Any departure applicable can be reviewed to aid in the establishment of a reasonable sentence.

The Federal Sentencing Guidelines originally required a departure to be established by an "outside the heartland" or "extraordinary circumstances" evaluation. That is no longer necessary in light of United States v. Booker, 125 S.Ct. 738 (2005). A Court can now consider what was once not ordinarily relevant under the Guidelines as relevant. However, even the terminology of "not ordinarily relevant" did not restrict an issue from being a basis for a departure.

**1). U.S.S.G. § 5H1.5 Employment Record**

Pursuant to U.S.S.G. § 5H1.5 the employment record of a defendant was not ordinarily relevant, but is relevant now in light of Booker. Any downward departure consideration need not be based on an "outside the heartland" analysis in order to determine whether or not an excellent employment history in combination with other factors can be used for a sentence that is less than the Guidelines call for. *See* United States v. Jagmohan, 909 F.2d 61 (2nd Cir. 1990); United States v. Alba, 933 F.2d 1117 (2nd Cir. 1991); and United States v. Big Crow, 898 F.2d 1328 (8th Cir. 1990). Though these cases discuss employment history in combination with other factors from a pre-Booker perspective that can be used for a downward departure, these factors are even more relevant now in light of the advisory nature of the Guidelines. Dr. Reed's employment history and service to the community are extraordinary and are just one basis the court can use to consider a downward adjustment or variance in any sentence to be imposed.

**2). U.S.S.G. § 5H1.6 Family Responsibilities and Community**

In addition to the above, family ties, responsibilities and community ties are relevant under the Federal Sentencing Guidelines pursuant to U.S.S.G. § 5H1.6. In this case, Dr. Reed's contributions to the community are vast. They are not only financial but medical. His contributions to patients have

been extraordinary and his gift as a surgeon is the basis for which many people today can walk without pain. There is evidence of this from the unusual amount of letters the court has received regarding Dr. Reed's work and skills.

Dr. Reed is the primary support for his children. He pays $7,200.00 per month in child support alone. Though some incarceration is anticipated, this is another reason a sentence below the guidelines is called for. Dr. Reed will have difficulty in getting any work that could come close to paying this amount of support. He has three children ages 10, 12 and 14. Dr. Reed is also responsible for $1,000.00 per month in alimony. Additionally, there is a great deal of trauma with the family relations because of the highly contested divorce and Dr. Reed's present circumstances. Close contact with the children is important to both Dr. Reed and his children in their ability to overcome not only the contentious nature of the divorce and emotional stress the children are experiencing from the separation of their parents, but now the incarceration of their father who they love and adore. The children of Dr. Reed are having to deal with an extraordinary amount of emotional pain from a very public divorce and now are dealing with a very public criminal event that has taken there father from them entirely. This situation is not ordinary to any parent who may go to jail. The complications from the divorce and the status of

22

Dr. Reed in the community bring a different set of circumstances to the table than mere separation due to incarceration.

Extraordinary family circumstances were widely accepted as a valid reason for departure in the past and, clearly, under the standards that are applied in Booker, are relevant today. *See* United States v. Big Crow, 898 F.2d 1326, 1331-32 (8th Cir. 1990); United States v. Jackson, 756 F.Supp. 23, 27 (D.D.C. 1991). *See also* United States v. Canoy, 38 F.3d 893 (7th Cir. 1994) (The court may depart from the applicable guideline range once it finds the defendant's family ties and responsibilities or community ties are so unusual they may be characterized as extraordinary). "Extraordinary" is no longer necessary in light of 18 U.S.C. § 3553 factors for offender characteristics and safety to the community. *See also* United States v. Gerard, 782 F.Supp. 932 (S.D.N.Y. 1992)(promising future for two children plus thirteen-year history of employment provided extraordinary reason to depart). Dr. Reed's 18 years of surgical and community service are well documented, noteworthy and relevant to sentencing.

### 3). U.S.S.G. § 5H1.11 Public Service

U.S.S.G. § 5H1.11 authorizes departure powers of the court under the Guidelines for military, civic, charitable or public service including employment related contributions. In Dr. Reed's circumstances, his employment has provided the community

with an amazing gift. His contributions to his patients and the hospital in the area of Panama City are well-documented. The type of surgeries he has performed and the life gift he has given to those who have been disabled is extraordinary. Dr. Reed's skills would be better served if he could keep his license and donate time to the veteran's hospital. Unfortunately without a medical license this would not be possible, but this would be more productive under the circumstances of this man's life and gifts. As an alternative to provide actual medical care, Dr. Reed could speak to Doctors and other medical professionals about the pitfalls of drugs and their abuse. He could volunteer time to public clinics in support services that on a daily basis would remind him of what he has lost for the mistakes he has made in this case. Clearly these are powerful alternatives to incarceration that are advocated by an individualized sentencing scheme authorized by statute and law. The price Dr. Reed will pay for his conduct in this case amounts to a lifetime of punishment.

**4). U.S.S.G. § 5K2.0 General Departures, Aberrant Conduct**

In Dr. Reed's case there are other unique grounds for a downward departure pursuant to U.S.S.G. § 5K2.0. Such considerations include the fact that the circumstances surrounding the offense are aberrant in nature. Though Dr. Reed repeated his conduct in the purchase of the two kilos of

cocaine, his actual behavior is aberrant when looking at the totality of the circumstances surrounding his whole life before his involvement in this case.

Dr. Reed is a 55-year-old orthopedic spinal surgeon who has no history of wrongdoing. He has paid his taxes, contributed to society and been a productive citizen. He has employed eleven people and provided millions of dollars to hospitals in services provided through the surgeries he has performed. He has helped people through the practice of medicine and financial donations all of his life.

When we look at the scope of Dr. Reed's background and what he has accomplished and contributed to society before the instant offense occurred, we have to look at what happened to change this extraordinary life and why. People make mistakes. Some are more severe than others. The circumstances of this case will devastate Dr. Reed more than any other individual in this case will ever experience. His life is in financial disarray, he has had to close his office without the opportunity to do so in a compassionate and caring way with his staff, (though he continued to pay them for thirty days while he tried to close his office after he was incarcerated), and the hospital and community have lost an extraordinary surgeon. He has lost his medical license, his reputation and his identity as a renowned surgeon forever. This is not commonplace, and under the

25

circumstances is not something Dr. Reed would have seen through the haze of his addiction before it happened. In light of the fact that what happened in this case is related to an addiction problem exacerbated by mental health consequences from various life-changing events and undiagnosed physiological problems, leniency in sentencing is appropriate. If everyone was capable of stopping in the middle of a crisis, a mistake, or the chaotic changes we experience in our lives to evaluate the consequences of our actions, then no mistakes would ever be made. Learning from our mistakes can be accomplished in other ways besides incarceration. In this case, Dr. Reed's conduct is aberrant and inconsistent with who he is.

In United States v. Rivera, 994 F.2d 942 (1st Cir. 1993) the court stated that the guidelines themselves recognized that the "circumstances that may warrant departure from the guidelines...cannot, by their very nature, be comprehensively listed and analyzed in advance." When such unforeseen circumstances rise, the district court will decide whether to depart and to how much by examining the unusual nature of these circumstances and making a judgment about what is appropriate. The structure and theory of both relevant individual guidelines and the guidelines taken as a whole may inform that judgment. The sentencing statute also lists general relevant sentencing factors including "the nature and circumstances of the offense,"

the "history and characteristics of the defendant," and the basic purposes of sentencing, namely, just punishment, deterrence, incapacitation, and rehabilitation. The guidelines cannot dictate how the court should sentence in special, unusual or other than ordinary circumstances. In United States v. Marchello, 13 F.3d 752 (3rd Cir. 1994), the Third Circuit rejected the theory that "aberrant behavior" can only be a single unplanned act. The Ninth Circuit Court of Appeals has determined that the existence of an "aberrant behavior spectrum" can make a difference in determining how a court assesses a mitigated sentence. *See* United States v. Dickey, 924 F.2d 836, 839 (9th Cir. 1991). In determining whether an offense falls within "this spectrum" and constitutes a single act of aberrant behavior, the court should look to the totality of the circumstances. This being the case, the Ninth Circuit stated that it is fair to read "single act" to refer to the particular action that is criminal even though a whole series of acts leads up to the commission of the crime.

The Court need not use the "heartland" analysis to create such a sentencing disposition post-Booker. The following factors converge to create a combination of factors this Court can consider for a downward departure in the traditional pre-Booker sense of a Guideline analysis:

1.    Dr. Reed has lost his license to practice medicine and will lose it for a minimum of 15 years after the completion of any sentence imposed by the Court in the instant case. As such, Dr. Reed is not likely to be able to practice medicine again due to his age. The 15 years is a minimum, but the sanction could be more including complete revocation of his license for life. Even if a 15 year suspension is imposed (which is not likely), the Florida Department of Health never has to reinstate Dr. Reed's license. (Dr. Reed if reinstated to practice medicine would be at a minimum 75 to 80 years old. This represents at least 15 additional years of punishment beyond any federal sentence).

2.    Dr. Reed has forever lost all of his financial income as a Doctor. His financial circumstances are in disarray, and will create long-term financial obligations and problems that Dr. Reed will never be able to meet due to the substantial loss of income. His present debt without substantial employment is overwhelming. The sheer magnitude of Dr. Reed's business and financial obligations are extraordinary. Dr. Reed has gone from making a million dollars a year to making nothing. Financial punishment is not adequately considered by the guidelines and is far more devastating to Dr. Reed than any other defendant.

3.    Dr. Reed has lost the ability to see his children on a regular basis. They were already devastated by a public and contentious divorce. Dr. Reed is responsible for $7200.00 a month in child support alone. The children depend on this support and he is the only one to provide it.

4.    Dr. Reed has lost his business, medical identity and reputation for life.

5.    Dr. Reed has suffered from mental health problems that were not identified or treated. If they had been, this may have changed the outcome of the present circumstances he finds himself in.

6.    A large number of individuals have lost their jobs as a result of Dr. Reed's incarceration. These individuals are suffering financially because they were not given warning or opportunity to find new jobs before Dr. Reed had to close his practice as a result of his incarceration after the entry of his plea of guilty.

8.    Dr. Reed came forward immediately after being charged and accepted responsibility for his conduct. He has fully cooperated with the government in admitting his criminal conduct. He will not be eligible for any 5K1.1 mitigation because he is not entrenched in the drug activities of Melara and Espinosa.

9.   The primary co-defendants in this case have prior convictions and long-term activity in drug related crimes. Some are here illegally and had the intention to distribute drugs long before they met Dr. Reed. Many of the co-defendant's "contributions" to society have been harmful for a long period of time. They never contributed, or intended to contribute, to society as Dr. Reed has for the past 55 years. They will also not suffer the life-long losses Dr. Reed will experience.

The above list offers individual factors that would warrant a departure under the Federal Sentencing Guidelines. But even if the above-referenced factors individually did not warrant a departure from the final determination of the Sentencing Guidelines, a combination of the above-referenced factors does. Together they represent an unusual case outside the heartland of cases warranting leniency or a downward departure. *See* United States v. Takai, 941 F.2d 738 (9th Cir. 1991)("any combination of factors may constitute a circumstance which warrants mitigation of a sentence under the guidelines"). *See also* United States v. Dickey, *supra* and United States v. Jagmohan, *supra*. *See* United States v. Pagan, 930 F.2d 1486 (10th Cir. 1991).

30

**B.    18 U.S.C. § 3553 Factors**

**1.    Nature and Circumstances of the Offense, and History and Characteristics of the Defendant as described in the above-referenced material and community support documents.**

The information contained in this memorandum is vital to the Court's analysis of how to determine an appropriate sentence for Dr. Michael Reed. It is also significant to note the circumstances surrounding the events of this case are outside the general character of Dr. Reed and do not reflect upon the type of person he is in the community. In balancing the nature and circumstances of the offense with the history and characteristics of the defendant, his family, medical, and life history, this Honorable Court should be encouraged to impose a sentence more lenient than the Guidelines call for. Clearly a person such as Dr. Reed can get the message of deterrence and punishment without lengthy incarceration. The guidelines in this case are not reflective of the type of person Dr. Reed is and therefore are more than necessary to accomplish the goals of justice.

**a.    The need for a sentence to be imposed to reflect the seriousness of the offense and promote respect for the law and provide just punishment for the offense.**

The circumstances surrounding this case indicate that Dr. Reed can benefit most from a shorter sentence. He is the type of individual who will be rehabilitated quickly, will understand

31

the ramifications of his conduct, and will not be a threat to society or himself. Dr. Reed will have years of punishment after his incarceration no one else will experience. Any sentence, even a shorter one than the Guidelines call for, will reflect the seriousness of the offense, promote respect for the law and provide just punishment. This is especially true in light of the unusual collateral damage and consequences Dr. Reed alone faces. Losing one's livelihood, status, finances, family, community and future will tell the public what is at stake as consequences of criminal conduct. What happened to Dr. Reed will promote respect for the law and clearly is more than just punishment. Respect for the law can be achieved in other ways besides incarceration, as was evidenced in the case of Rapper TI and other cases identified in the attached statistics, (**Exhibit F**). There is no threat of unjust disparity if Dr. Reed received a lower sentence than the guidelines call for when examining the case of TI and the attached statistics. In fact, to not give Dr. Reed a downward departure consideration would result in an unjust disparate outcome because he is being treated more harshly than others with less education merely because of his status and education.

**b.    To afford adequate deterrence for criminal conduct.**

Deterrence is a general category of criminal justice theory. Its purpose is to determine what would be an adequate

32

deterrent to the defendant or the community if the defendant's circumstances were known. Clearly Dr. Reed needs no further deterrence. He is intelligent enough and now clear-headed enough to see the end result of his poor judgment. He is also now better equipped to deal with the cause and effect relationship of his life circumstances and his poor judgment by seeking the necessary help he needed. Therefore, the remaining theory of deterrence is social and not individual. In this case the status, reputation and respect Dr. Reed is gone for the remainder of his life. He and his children have been devastated by the media attention paid to him individually. This alone has been a deterrent effect to society. The length of the term of incarceration is not as relevant as the sudden impact of it. Shock incarceration is a vital tool in deterrence both to the defendant and others in the community. Dr. Reed experienced shock incarceration by being incarcerated after he pled guilty. This experience is a substantial deterrent to him and others. He should not, however, be singled out in this case as the poster child for deterrence. His status in the community and his education should not be a detriment but should be a benefit in recognizing that he is the type of individual who does not need lengthy incarceration in which to resolve his legal problems or to return to the community.

33

Care should be taken to evaluate and cautiously view Dr. Reed's status as a means to effect public perception. Dr. Reed's circumstances justify a lenient sentence, public perception should have no bearing on that decision. It is the totality of the circumstances that only the Court knows that should affect the way a sentence is imposed. The public cannot know every detail and should not be appeased by the mere incarceration of Dr. Reed without the temperance of the Court in acknowledging the additional life-long punishment Dr. Reed alone will have to face.

**c.    To protect the public from further crimes of the defendant.**

In this case, the public is not in any danger or jeopardy. Dr. Reed is 55 years old and has never been a danger to the community and will not be in the future. Additionally, there is no indication that the public is in danger as a result of the nature of this offense. This is a very unique offense as it relates to Dr. Reed's limited time involvement. Though he paid for cocaine that was partially distributed by Melara to the community, it is important to note that Melara was doing this long before Reed purchased any cocaine from him.

**d.     To provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.**

There is no indication that Dr. Reed needs education or vocational training or medical care in a correctional setting. There is, however, an indication that he is in need of continued family and personal counseling concerning his drug addiction which will offset further difficulties for himself and his children in the future.

The Guidelines fail to consider Dr. Reed's outstanding character. This Court has before it supportive letters, medical records, documents, and other information which recognizes that the character of Dr. Reed is consistent with the type of person who does not need to be incarcerated. In cases where the defendant led an otherwise praiseworthy life, the Court can consider a sentence below the advisory range. *See* United States v. Page, No. 04-CR-106, 2005 U.S. Dist. LEXIS 19152, at 12 (E.D. Wis. August 25, 2005); United States v. Ranum, 353 F.Supp. 2d 984, 986 (E.D. Wis. 2005).

The ruining of Dr. Reed's reputation alone is significant punishment and is a basis for a less severe sentence. (*See* United States v. Libby, where Scooter Libby was convicted of perjury and obstruction of justice and received a 30-month Guideline sentence. President Bush pardoned him for his service

35

to the community and country and the long-term affect the conviction would play on the rest of Libby's life).[4]

## C.    Statistical Information also supports a mitigated sentence

The U.S.S.C. (United States Sentencing Commission) database maintains a comprehensive computerized data collection system of federal sentencing information. This collection contains information on federal criminal cases sentenced under the Sentencing Guidelines and policy statements to the Sentencing Reform Act of 1984. The data files included in this study contain all cases received by the United States Sentencing Commission that were sentenced between October 1, 1998 and September 30, 2008.

The United States Federal Courts handled over 670,000 criminal cases between the fiscal years of 1999 and 2008. The United States Sentencing Commission estimates that 99 percent of all cases are included in this database. The purpose of the analysis of this information was to determine how many defendants similar to Dr. Reed received probationary sentences and to provide explanations where possible of why that defendant received such a sentence.[5]

There were 576,147 cases representing 85 percent of all cases that were reviewed. Cases were only selected that were

---

[4]    http:/www.whitehouse.gov/news/releases/2007/07/20070702-3.html
[5]    Breakdown and analysis of this information was provided by NCIA (The National Center on Institutions and Alternatives, a nonprofit organization).

36

scored according to U.S.S.G. § 2D1.1 for unlawful manufacture, importing, and exporting or trafficking (including the possession with intent to commit these offenses and conspiracy). There were 222,896 cases of this type. Those cases where the defendant had a criminal history score of more than one were deleted, leaving 120,036 cases remaining. Where the defendant was convicted after trial, these cases (4,497) were also deleted, leaving 115,539 cases remaining. Cases where the safety valve was not applied were also deleted, leaving 75,996 cases remaining. Cases where the defendant received a downward departure pursuant to 5K1.1 were also deleted, leaving 56,281 cases. Those cases with missing or incomplete sentencing information and non-cocaine cases were also deleted, leaving 14,332. These remaining cases were sorted to remove those where a sentence of imprisonment was imposed. This eliminated 14,029 cases, leaving 303 remaining. Finally, the remaining cases were sorted by weight of cocaine involved, and cases were deleted with missing or incomplete information. There remained 299 defendants who received a probationary sentence, 158 of them received a total base offense level in Zone A or B. These 158 were eliminated, leaving 141 defendants who received probation for a variety of reasons. Of the remaining 141, 39 received probation with a drug quantity of two kilos of cocaine or more, (**Exhibit F**).

37

This Honorable Court can clearly see from this information that a number of defendants received the benefit of probationary sentences as a result of varying factors including but not limited to those that are evident in Dr. Reed's circumstances. What is also of consequence is that many of these cases are women and many are persons with only high school educations. Therefore, Dr. Reed should not be discriminated against merely because he has a higher level of education and should have "known better." Addiction does not discriminate between age, education or other life circumstances. Being educated alone does not always help you make smart choices when faced with emotionally devastating problems and life-changing circumstances. It is also unfair to focus solely on the addiction issue. The abuse of alcohol and later drugs in this case is temporary and event motivated. Therefore, with counseling Dr. Reed is not likely to repeat his actions, much less engage in any future criminal conduct. There is no long-term history of drug or alcohol abuse.

**D.    Defense Sentencing Recommendation**

A probation sentence is well within the discretion of this Court under the circumstances of this case and sentencing precedent in similar case. If incarceration is imposed by the Court, the following is the defense sentencing recommendation

authorized by the Guideline and non-Guideline factors presented in this memorandum:

1.   Relevant Conduct: 2 kilos of cocaine;                         28

2.   Acceptance of Responsibility;                                 -3

3.   Safety Valve pursuant, 5C1.2;                                 -2

4.   Guidelines;                                         46-57 months

5.   Departure and variance recommendation;            12-18 months

Such a sentence is supported by precedent, with the recognition that there is also adequate legal and statistical support for probation and for a shorter period of incarceration. With this sentence, if imposed, it is also recommended that Dr. Reed provide 500 hours of community service to the medical profession in speaking of the pitfalls of addiction and poor life choices and/or to a charitable medical clinic or foundation doing work in support of the doctors and community the clinic or foundation serves. (E.g. Doctors Without Borders as a non-doctor aide to the medical staff or in a free medical clinic that serves those less fortunate). In providing 500 hours of volunteer work in a community service organization, Dr. Reed would be subject to a period of community service in addition to some incarceration.

Creative community service, in the form of volunteer work, is supported by the fact that it would provide:

1.  An active role on the part of the offender in becoming conscientious of his behavior in relationship to others.

2.  Socially constructive consequences from this volunteer service.

3.  Consequences that are related to the offense in that they are a constant reminder that the service is without compensation.

Dr. Reed can do more for the community if he remains in it. The shock incarceration he has already experienced is in and of itself just punishment which has already been effective. Dr. Reed has made positive changes in his life and will continue to do so. Therefore, a sentencing plan which restricts his movement for a shorter period of time than the Guidelines call for, coupled with substantial community service hours, is equally as important as any other concept of punishment, and is actually better for the community in this case than incapacitation through incarceration. Any mitigation of the sentence through the use of community service does not diminish the impact of the offense, punishment or the perception of unjust leniency. Clearly with Dr. Reed's background, contributions and the permanent life losses he has suffered already, a sentence below the guidelines is warranted. It should be noted that Dr. Reed,

40

by the time of sentencing, will have satisfied all of his forfeiture obligations.

As a part of any sentence imposed, whether in custody or out, it is respectfully requested that the court recommend a drug treatment program in the community or that Dr. Reed receive the benefit of the RDAT program, (Rehabilitation Drug and Alcohol Treatment program), offered by the Federal Bureau of Prisons, and that he be placed at the prison camp facility at Pensacola, Florida, or Montgomery, Alabama, to encourage family visitation in close proximity to his children.

Respectfully submitted,

/s/Marcia G. Shein
Counsel for Defendant
Georgia Bar No. 639820
Federal Bar No. 53667
2392 North Decatur Road
Decatur, Georgia 30033
(404) 633-3797
(404) 633-7980 (fax)
Marcia@msheinlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that I have this date mailed a copy of the

foregoing to:

Gayle Littleton
US Attorney
30 W Government St.
Panama City, FL 32401

Lori E. Masso
Sr. U.S. Probation Officer
U.S. Courthouse
30 W. Government Street
Panama City, FL 32401

by depositing a copy of same in the United States Postal Service
with adequate postage affixed thereon to ensure its delivery.

This 26th day of October, 2009.

Respectfully submitted,

/s/Marcia G. Shein
Counsel for Defendant
Georgia Bar No. 639820
Federal Bar No. 53667
2392 North Decatur Road
Decatur, Georgia 30033
(404) 633-3797
(404) 633-7980 (fax)
Marcia@msheinlaw.com

42